UNITED STATES of America, Plaintiff–Appellee,

v.

Howard MEDLEY, Defendant–Appellant.

No. 89–3780.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1990.

Decided Sept. 21, 1990.

As Amended on Denial of Rehearing Nov. 26, 1990.

Sean Martin, Barry R. Elden, Asst. U.S. Attys., Office of U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

George N. Leighton, Neal & Associates, Stanley L. Hill, Vickie Voukidis Blum, Hill & Associates, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., CUDAHY, and POSNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

At the outset of oral argument, defendant-appellant Howard Medley's distinguished appellate counsel[1] characterized

---

1. Former District Judge George N. Leighton of the Northern District of Illinois, now of the firm

the broad issue in this case to be, "Whether the judges of this court will give their mark of approval to the verdict of a misled jury and a conviction procured by the government that was and is unjust." There is arguably some support in the record upon which to base Medley's characterization of this case. From our perspective, however, we conclude the jury was not misled and the government was not unjust in its prosecutorial actions. Reversal is not warranted. To understand the context in which this unusual case arises requires we look at its procedural history, and then examine in some detail the trial and the evidence.

## I. THE PROCEDURAL HISTORY

In April 1988, the grand jury returned a forty-one count indictment against Medley and eight other defendants alleging numerous crimes related to fraud and bribery (the use of the term "bribery" is an issue in this case) involving the Chicago Transit Authority ("CTA") and the Metropolitan Petroleum Company ("Metropolitan"), a privately owned motor fuel supplier. Included as defendants, relevant to this appeal, were Brian Flisk, an officer of Metropolitan, and Metropolitan. Only three of the counts were against Medley. Medley was charged with mail fraud under 18 U.S.C. § 1341; accepting a thing of value with the intent to be influenced or rewarded under 18 U.S.C. § 666; and perjury before the grand jury under 18 U.S.C. § 1623. The following month a superseding indict-

ment was returned against the defendants, but it contained no new allegations against Medley. The following September Judge Kocoras granted Medley's motion to sever his trial from the trial of the other defendants. Severance was followed in October by the return of another superseding indictment against only Medley. This indictment did not include the prior mail fraud count but did reallege the perjury and acceptance of a thing of value counts contained in the previous indictment. Newly added were a charge of conspiracy to violate section 666 under 18 U.S.C. § 371, and a charge of Hobbs Act extortion under 18 U.S.C. § 1951. Thereafter, Judge Kocoras dismissed the Hobbs Act and conspiracy counts. After eleven days of trial on the perjury and acceptance of a thing of value counts and three days of jury deliberations, the jury announced it was deadlocked and a mistrial was declared.

A third superseding indictment was then returned against Medley again charging him with extortion under the Hobbs Act (Count I) and acceptance of a thing of value under section 666 (Count II). The district court dismissed the Hobbs Act charge and trial proceeded only on the remaining section 666 charge.[2] During a six-day trial the defendant did not testify and presented no evidence in his own behalf. The defendant did offer some documentary evidence, but that was largely used by the government and is not significant in this appeal. The jury found Medley guilty of

---

of Earl L. Neal & Associates, represented the defendant on appeal.

**2.** Count II of the third superseding indictment charged:

> In or about January through April 1987, at Chicago, in the Northern District of Illinois, Eastern Division,
>
> HOWARD MEDLEY,
>
> defendant herein, being an agent of the CTA, an organization which annually received benefits in excess of $10,000 in federal funds under a program administered through the United States Department of Transportation, accepted and agreed to accept a thing of value, namely a payment of approximately $25,000 from Brian Flisk and Metropolitan Petroleum, intending to be influenced and rewarded in connection with business, transactions, and a series of transactions between Metro-

politan Petroleum and the CTA involving a diesel fuel contract that Metropolitan Petroleum had with the CTA which had a value in excess of $5,000.

> In violation of Title 18, United States Code, Section 666.

The directly relevant portion of section 666 provides:

> [whoever] corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more ... shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666.

accepting and agreeing to accept $25,000 from Flisk with the intent to be influenced and rewarded in his duties as a CTA board member. Medley was sentenced to a thirty-month term of imprisonment and fined $10,000. This appeal followed.

Medley raises three issues: 1) whether the trial court committed error in permitting the government to call Flisk as its witness; 2) whether the trial court committed error in instructing the jury; and 3) whether the trial court committed error in denying Medley's motion for acquittal made at the close of all the evidence and again following the guilty verdict on the basis that the evidence did not prove beyond a reasonable doubt that the money actually paid to Medley by a person named John Wilson was a thing of value from Flisk and Metropolitan as charged in the indictment.

## II. FACTUAL BACKGROUND

 In the first trial, which resulted in a hung jury, Medley presented evidence in his defense, but in his second trial Medley presented little evidence of consequence. In examining the record we therefore have almost nothing to review except the government's evidence. When reviewing a favorable jury verdict we must view the evidence in the light most favorable to the government if it establishes that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *United States v. Field*, 875 F.2d 130, 137 (7th Cir.1989). The government is also entitled to all reasonable inferences from the evidence. *United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989). The evidence heard and resolved by the jury is set forth in some detail.

In October 1986, Metropolitan, headed by Brian Flisk, entered into two, two-year contracts with the CTA to be the CTA's exclusive supplier of diesel fuel for its 2,200 vehicles. These contracts, totaling $38 million, were viewed as Metropolitan's largest and most important contracts. Flisk was awarded the CTA diesel fuel contracts by agreeing to provide the CTA with substantial discounts in the price per gallon of diesel fuel provided the CTA paid the fuel invoices within specified limited periods. Flisk also agreed to meet the CTA's Disadvantaged Business Enterprise or Minority Business Enterprise requirement. Flisk ostensibly complied with this latter requirement by specifying Casey Fuels as the minority-run subcontractor that would deliver part of Metropolitan's fuel to the CTA. A percentage of Metropolitan's profits under the contract, therefore, would pass to a minority business.

In entering into these contracts, with discounts for prompt payment, Flisk relied on his belief that the CTA would not be able to pay its fuel bills within the discount time, but the problems began when the CTA surprised him, and did. The CTA promptly paid the invoices and took the maximum price discounts. The result was that Metropolitan began losing money on its sales to the CTA. The financial effect on Metropolitan and Flisk was described as "devastating" by a Metropolitan official. Soon Flisk resorted to sending the invoices to the CTA late so as to prevent the CTA from remitting payment in time to take advantage of the discount price. Later, as an alternative, Flisk began sending inflated invoices so that even when the CTA could take advantage of the prompt payment discount, the CTA unknowingly still paid full price. The CTA's Internal Audit division became suspicious and began an investigation into Metropolitan and its CTA billing practices in late November and early December of 1986. In early January 1987, Flisk learned of the investigation after two Internal Audit investigators visited his company and spoke to his employees. Flisk feared that the possible loss of these CTA contracts would put Metropolitan out of business, and later in July 1987 that happened.

In late January or early February 1987, Howard Medley, a member of the CTA's Board of Directors, met his longtime friend Robert Sperling at a health club in Chicago. Sperling was a partner in a Chicago law firm. Medley knew Sperling from their

prior work together at the Chicago Board of Election Commissioners. Sperling, his law partner Michael Zavis,[3] and several other individuals co-owned a large commercial warehouse in Chicago that had just lost its tenant and was facing severe financial difficulties. Sperling told Medley that the partners were looking for a purchaser for the multimillion dollar property, and that a substantial commission would be paid to anyone who could secure a buyer. Medley was interested in trying to find a buyer.

While Medley was keeping an eye out for a buyer for the warehouse, Flisk was looking for someone to help him defuse the CTA investigation. Flisk turned to Medley for assistance in connection with the investigation. Howard Weitzman, Flisk's personal friend and Metropolitan business partner, set up a first meeting with Medley in Medley's CTA office. Later Medley, Flisk, and Weitzman had a second meeting which began in a restaurant and then moved to Medley's apartment. At the apartment meeting, Flisk and Medley discussed CTA matters, Metropolitan's fuel contract, and Medley's needed assistance with Metropolitan's "problem." Flisk, in his trial testimony, admitted that at this meeting he and Medley also had a discussion about the matter of purchasing the Sperling and Zavis warehouse. Medley suggested that Flisk purchase the building. Flisk learned that Medley would stand to gain a $300,000 commission if Flisk bought the building. Flisk was willing to pay a commission to Medley because Medley was "helping" him with the CTA investigation. In his testimony Flisk referred to Medley's CTA investigation help and the warehouse commission as a "quid pro quo."

After his apartment meeting with Flisk, Medley contacted Sperling and told him that he knew an individual who was interested in the warehouse property. On Medley's recommendation, Flisk and Weitzman looked at the warehouse, met with Sperling and other partners in the warehouse property, and began to negotiate for its purchase or lease. Medley, through Sperling,

monitored the negotiations. At this time, a CTA ethics ordinance prohibited a CTA board member, which Medley was, from doing business with CTA vendors such as Flisk.

On February 20, 1987, at the same time Flisk was negotiating for the lease or purchase of the warehouse property, the CTA's Internal Audit division disseminated the report of its Metropolitan investigation to the CTA's Board of Directors, including Medley. That report documented and criticized Metropolitan's billing irregularities that prevented the CTA from paying the invoices in time to receive the discounts to which the CTA was otherwise entitled. The report also raised serious questions as to whether Casey Fuels was a legitimate minority enterprise subcontractor, or whether it was a sham pass-through corporation fraudulently misused by Metropolitan to meet the CTA's minority business requirements. Prior to the next full board meeting on March 4, 1987, the report was leaked to the press, and Metropolitan came under scrutiny and attack in the media.

During the public session of the CTA board meeting on March 4, 1987, board member John Hoellen pointed to the allegations in the Internal Audit report and moved to rescind and terminate the Metropolitan–CTA contract. Medley spoke out at the board meeting about a conversation he said he had had about the report with the CTA purchasing agent, Ed Tobin. Tobin, however, denied that he had spoken to Medley about the report. Potential litigation with Metropolitan was mentioned at the meeting. The investigation was then referred to the CTA Purchases and Sales Committee for a report back to the board.

The Purchases and Sales Committee was chaired by board member Natalia Delgado. During the ten-minute break between the public and closed sessions of the March 4 board meeting, Medley approached Delgado. Medley told Delgado that Casey Fuels was actually getting ready to deliver the

---

**3.** These individuals, Sperling and Zavis, are not implicated in any wrongdoing in connection with Metropolitan and the CTA.

fuel, and that unknown persons were "out to get Metropolitan because they didn't like minority subcontracts...."

On March 6, 1987, two days after the board meeting, Medley called the CTA affirmative action staff head Larry Murphy into his office. Already present in Medley's office when Murphy arrived were Flisk and Clarence Casey, owner of Casey Fuels. Medley told Murphy to prepare a report proving that Casey Fuels, the minority subcontractor, was participating in the Metropolitan contract. Murphy replied that he had no information to that effect, and Medley then directed Casey and Flisk to provide the information to Murphy.

Immediately after he spoke with Murphy, Medley called CTA senior staffer and purchasing agent Tobin into his office. Present at that time were Medley, Flisk, Casey, and Murphy. Medley told Tobin that he was looking into the minority subcontractor and invoicing allegations in the Internal Audit report. Tobin warned Medley not to discuss the matter in front of the vendors, Flisk and Casey, the subjects of the investigation, because of the possibility of future CTA litigation with them. This was the only time Tobin had ever seen a CTA board member attempt to discuss a disputed contract in the presence of the vendors. Tobin was so disturbed by Medley's conduct that he immediately went to the CTA staff chairman and wrote a memo detailing what had occurred in Medley's office.

A week later, again in the presence of Flisk and Casey and in direct contravention of Tobin's warning, Medley gave Murphy a stack of papers from Flisk, and told Murphy to "go back and take care of the minority." Murphy examined the papers and, considering them irrelevant, did not write any report. A week later, Medley again called Murphy into his office, and Murphy told him that the papers from Flisk did not prove anything. Medley responded, "O.K. That's all." Medley never reported to the CTA board that the CTA staff head of affirmative action had found Metropolitan's and Casey's evidence on the minority issue to be meritless.

On March 17, 1987, Internal Audit issued a second report critical of Metropolitan. This report noted numerous complaints about Metropolitan's diesel fuel quality pointing out that the percentage of impurities was too high in samples taken from Metropolitan delivery trucks. On March 19, 1987, CTA employees were told to start testing Metropolitan's fuel by visual examination for particles and water. On that day, Byron Harvey, a twelve-year CTA employee who received fuel deliveries at a CTA garage, took a fuel sample from a Metropolitan delivery truck. Harvey believed the sample looked too light and cloudy for diesel fuel. Harvey took that sample to his supervisor Terry Short, a foreman with twenty-three years experience. Short decided to reject Metropolitan's fuel delivery. By the time Short had returned to the waiting Metropolitan fuel truck to tell the driver about the rejection, Flisk had pulled up in his car. Within minutes of Flisk's arrival, Medley also arrived in his car. Both Short and Harvey noted that they had never seen Medley at the garage either before or since that time. Phone records indicated a number of calls from Flisk's car phone to Medley's car phone just before Medley arrived at the garage. Flisk admitted that he had called Medley to assist him at the garage.

When Medley arrived at the garage he talked to Flisk first, and then he and Flisk approached supervisor Short. Short told Medley that the fuel sample was taken from the truck, and that it was too cloudy. Medley said that the fuel looked "acceptable" to him. Short then accepted the load, not wanting to countermand the implied directive of a CTA board member.

There was evidence of other phone calls on March 19 by Medley. From his home, Medley called Delgado at her law office and told her that Casey Fuels was delivering the fuel, and that fuel samples were being erroneously taken from underground tanks, not the delivery trucks. Delgado testified that the phone call was unusual because Medley never called her about substantive board matters, except once to ask her to vote for him as a committee chair-

man. Medley scheduled a personal meeting with Delgado for the next day to discuss the Metropolitan issue, but Delgado had to cancel the meeting because of an emergency legal matter at her office. Immediately after hanging up with Delgado, Medley called Sperling. Phone records for the remainder of the day showed numerous calls between Medley and Flisk, Medley and Sperling, Flisk and Sperling, and Medley and John Wilson, Medley's accountant who later accepted a $25,000 check from Flisk delivered to him by Weitzman for Medley.

On March 24, the day before a scheduled CTA Purchases and Sales Committee meeting, Medley called Delgado at her office. Medley again told Delgado that Casey Fuels was in fact delivering fuel under the contract. He told her he had gone to examine water seepage at the CTA's underground fuel tanks, and that the Metropolitan fuel quality samples were inaccurate because they were being taken from watersoaked fuel tanks, not the Metropolitan delivery trucks. Medley also told her that people were "out to get Metropolitan Petroleum." Medley did not tell Delgado that he had gone to the garage the previous week at Flisk's behest, that the sample at the 69th Street garage was taken from the Metropolitan truck, or that there was no water over the fuel tanks at that garage.

On March 25, 1987, the Purchases and Sales Committee met to discuss the allegations raised in the Internal Audit reports and to decide whether to recommend terminating the Metropolitan contract. Delgado reported to the committee what defendant Medley had told her about Casey Fuels delivering the fuel, and offered Medley's explanation for the questionable fuel quality samples. Based upon the information provided to Delgado by Medley and other information, the committee decided to recommend against terminating the contract.

Around the time the committee was investigating the Metropolitan allegations and relying on Medley's information to Delgado, Medley had a conversation with Zavis in Zavis's and Sperling's law offices in late March 1987. Zavis told Medley that the real estate partnership could not afford to pay Medley any commission on the warehouse real estate deal, but that Zavis would negotiate with the buyers, Flisk and Weitzman, to pay the commission to Medley. Zavis told Medley that he would get one-half of the total commission, and that Zavis and Sperling would each get one-quarter. Zavis then had a meeting in late March with Flisk, during which Flisk agreed to pay a $300,000 commission on the warehouse transaction, with $150,000 to go to Medley and another $150,000 to be divided between both Zavis and Sperling.

Also in late March 1987, Sperling called Medley and told him that a master lease agreement for the warehouse deal with Flisk was about to be consummated. Sperling told Medley that the deal would generate a commission payable to a licensed Illinois real estate broker but that Medley could not split the commission because Medley was not a licensed broker. Sperling also told Medley that he could not receive any money from the commission, directly or indirectly through another broker. Sperling told Medley that Medley could either designate a real estate broker of his choice to accept his share of the commission as a favor to the broker, designate a charity to which his share of the commission could be paid, or request that his share of the commission be paid as a political contribution to Medley's political party. Defendant Medley said that he wanted to consider the matter and that he would get back to either Zavis or Sperling. A short time before March 31, 1987, Medley called Zavis and told him that John Wilson was to receive Medley's commission. Medley gave Wilson's telephone number and address to Zavis. Zavis called Wilson, learned that he was a licensed real estate broker, took his name so that the commission check could be made out correctly, and gave the information to Flisk's attorney.

Medley had a meeting with Wilson to discuss Wilson's receipt of the payment in his behalf. Wilson was Medley's certified public accountant, but he also had a real estate broker's license. Wilson had used his real estate license only twice in twenty-

four years but had never used his license in a commercial real estate transaction. Medley told Wilson that he had earned a fee in a real estate transaction but that the people involved "were balking about it" because they wanted a licensed real estate broker "to accept the money." Medley then told Wilson that he wanted him to accept the money for him. With Medley still in his office, Wilson called his lawyer and asked him about Medley's suggestion. Wilson told Medley that the lawyer advised him that he could not share a commission with a nonlicensed broker, but if the commission were viewed as a finder's fee then his lawyer would research the law to determine the legality of that arrangement. The lawyer told Wilson that he would get back to him but never did. Wilson and Medley had no further conversations about the legality of sharing the fee. Medley never told Wilson any of the specifics of the transaction. Wilson never knew the type of real estate involved, the size of the deal, the location of the property, or about the CTA–Metropolitan problems.

While the real estate deal was drawing closer to completion, the CTA Board of Directors discussed the allegations about Metropolitan at its closed session on April 1, 1987. Medley and Delgado were in attendance. Delgado reported that her committee recommended against terminating the Metropolitan contract which, she explained, was based on the same information that Medley had provided her prior to her committee meeting on March 25, 1987.

Medley also spoke at the April 1 board meeting in support of Metropolitan. Medley's statements to the board contained numerous falsehoods. Medley stated that he had gone out to the CTA garage and found a foot of standing water around the underground fuel tanks. That was not true. On the date of his only visit to the garage there was no water over the tanks. There were a few puddles in the garage area, but they were at most less than an inch deep. Medley also told the board that the garage employees told him that the fuel samples came from the underground tanks not the delivery trucks. This also was false. Harvey had taken the sample from the truck,

and Short had specifically told Medley that the sample was taken from the truck.

At this April 1 board meeting Medley did not disclose to the board that he had had numerous meetings and conversations with Flisk during the same period in which the CTA was investigating Flisk, nor did he disclose that he also had had several meetings with Casey, the minority subcontractor. Medley also did not disclose that he had visited the CTA garage with Flisk and had personally found a rejected load of Metropolitan fuel at the garage to be "acceptable"; nor did he disclose that he was involved with Flisk in a real estate transaction in which he was to receive $150,000 from Flisk. After Delgado made her committee's recommendation to the board on April 1, the board voted not to terminate the Metropolitan contract. Delgado testified that as a board member, if she had known about the relationship between Flisk and Medley, she would not have given Medley's statements "anywhere near the weight that I gave them," and that she would not have reported Medley's statements to her committee but instead would have reported the Medley situation to the CTA's attorney.

On April 10, 1987, less than two weeks after the board's favorable decision, Medley met with Sperling at a club in Chicago. Sperling told Medley that Flisk and Weitzman were preparing to pay the real estate commission but that they were having cash difficulties and wanted to pay a portion of the commission in installments. Sperling told Medley that Flisk wanted to pay $150,000 of the $300,000 commission at the time of the signing of the deal but then pay the balance of $150,000 in six monthly installments of $25,000 each. Because Sperling and Zavis said they were having difficulties negotiating with Flisk, Sperling informed Medley that he and Zavis wanted their full half of the commission at the time of the signing and that Medley's designated broker should take the six monthly installments of $25,000 from Flisk. Medley agreed to that proposal.

Shortly before April 14, 1987, Medley called Wilson and told him that a man

named Weitzman, the Metropolitan associate of Flisk, would be bringing over the $25,000 check for Medley. On April 14, 1987, Flisk and Weitzman went to Sperling's office and wrote out a $150,000 check to Zavis, which was Zavis's and Sperling's half of the commission. Flisk then told Weitzman that Weitzman would have to deliver Medley's check to Medley's broker. Weitzman called Wilson to make sure he would be in his office to receive Medley's check. Later that day, Weitzman delivered the $25,000 check to Wilson. Wilson then called Medley to tell him he had his money. Medley instructed Wilson to write Medley a check for $22,500, and for Wilson to keep $2,500, or ten percent, for his trouble. The next day, Wilson deposited the Flisk check, and the day after that gave Medley a $22,500 check for the net balance of the first payment from Flisk. Wilson testified that his only role in the warehouse deal was as a middleman who made a few phone calls, accepted the check, and then gave Medley his money.

In early July 1987, the CTA terminated the Metropolitan contract for fraud. In April 1988, Medley was required to file an economic interest statement with Cook County for 1987, listing "any kind of payment from anyone having a contract or doing business with the CTA." The statement required disclosure of "any payments" from and "any financial relationships" with CTA vendors. Medley did not list the $22,500 payment from Flisk. Medley did list a $22,500 "finder's fee" on his income tax return filed at about the same time with the Internal Revenue Service, but the source of the fee was not shown on the tax return.

## III. ANALYSIS

As a prelude, Medley asks us to consider and re-examine the conduct of the assistant United States attorneys who worked on this matter through its earlier stages. Specifically, Medley complains about the original joinder, alleged prosecutorial misconduct, and abuse of the grand jury process. Those matters, however, were all previous-

ly resolved by the trial judge in Medley's favor, leaving only the one count for trial in this case. Those prior matters are not specifically made issues on appeal, only obliquely, apparently in an endeavor to show a pattern of government unfairness which Medley claims clouded all the proceedings. We will consider only the unresolved issues which Medley specifically raises arising out of this particular trial.

### A. *Government Witness Flisk*

■ The first relevant issue is the government's calling of Flisk, the principal officer of Metropolitan, as its witness. The government did not call Flisk in the earlier hung jury trial. After that time, however, on March 3, 1989, Flisk entered a plea of guilty to charges in the related indictment. The government advised Medley's counsel that under a grant of immunity the government would call Flisk in this trial. Medley responded on August 23, 1989, with a motion in limine.

Medley's motion in limine was not directed to Flisk's guilty plea, only to the use of Flisk's proffer to an FBI agent in 1987. The motion argued that this proffer, not otherwise admissible, would be used to impeach Flisk once he testified and exculpated Medley. Medley alleged that the only purpose in calling Flisk was to impeach Flisk and then to put Flisk's otherwise inadmissible proffer before the jury. The court denied the motion.

Flisk testified on direct about his grant of immunity and pleas of guilty to two counts of the related but separate indictment, and that was, Medley emphasizes to us, before the same judge, Judge Kocoras, who had previously accepted Flisk's guilty plea.[4] Flisk testified that he had pled guilty to racketeering, one of the allegations of which concerned the $25,000 he had paid to Medley through the warehouse transaction. Flisk also related that he had pled guilty to wire fraud. During Flisk's testimony, the government asked several questions implying that Flisk was not testifying truthfully. He was shown the tran-

---

**4.** Flisk was sentenced to four years incarcera- tion.

script of his grand jury testimony and of his change of plea proceeding, and, over an objection by Medley's counsel, Flisk read a portion of his plea agreement to the jury. This was all subterfuge to get inadmissible evidence admitted by way of impeachment, Medley now argues. Furthermore, Medley claims, the jury was permitted to take the plea agreement and change of plea transcript to the jury room during deliberations without the benefit of any limiting instruction about these documents.

The government responds by pointing out that Medley's motion in limine was addressed only to the exclusion of Flisk's proffer statement which Medley claimed would be used by the government to impeach Flisk. Medley's argument to us, however, is that the government improperly called Flisk to impeach him, not with the proffer statement but with his plea agreement and plea colloquy statements. In denying Medley's motion in limine, the district judge, who had accepted Flisk's guilty plea, found that there was a basis for the government to call Flisk without expecting him to exculpate Medley. The court described Flisk as a "central player" whose testimony the jury should hear. The court found "no reason" to believe the government was engaged in a subterfuge to impeach Flisk with his prior proffer, and that there was no basis to exclude Flisk from testifying. The court would not assume that Flisk would be untruthful under oath before the jury.

After Flisk testified and on six occasions failed to testify consistently with his plea colloquy and grand jury testimony, both of which were under oath, the court noted that Flisk's proffer, the only subject of the in limine motion, had not been used or raised. That motion, the court observed, proved to be meritless and what Medley had accused the government of attempting improperly to do was never attempted. Later, during post-trial motions, the court described Medley's position as "unreasonable," "unmeritorious," and "unsupported." Since the plea agreement and plea colloquy were not raised in the district court, our review is for plain error under FED.R.CRIM.P. 52(b).

In reviewing the propriety of the government's decision to call a codefendant as a witness and then to impeach him, we apply a "good faith" standard. The government is permitted to impeach a codefendant even though called by the government, *United States v. Peterman,* 841 F.2d 1474, 1479 (10th Cir.1988), *cert. denied,* 488 U.S. 1004, 109 S.Ct. 783, 102 L.Ed.2d 774 (1989), but we do not allow impeachment where it is merely a government subterfuge to get before the jury evidence otherwise not admissible. *United States v. Webster,* 734 F.2d 1191, 1192 (7th Cir.1984). It is a matter of the government's "good faith." *Webster,* 734 F.2d at 1192–93. This court affords great deference to the district judge who presided at trial. In this instance, the judge presided at both relevant proceedings.

As the trial court found and as is obvious from the record, the government's purpose was to elicit testimony from Flisk in accordance with his prior statements under oath. Briefly, this most important and central figure testified that he sought Medley's assistance as a CTA board member to protect Metropolitan from the CTA's investigation. Flisk also testified that he had two key meetings with Medley early after the investigation had started at which they discussed Medley providing Flisk and Metropolitan help with the CTA "problem." Most importantly, Flisk testified that this discussion was "in connection" with Medley's suggestion that Flisk consider the purchase of the warehouse offered by Sperling and his partners. Flisk testified one of those meetings was in Medley's apartment. Further, he acknowledged that he was responsible for providing the $25,-000 check partial payment for Medley and that Wilson was only an intermediary to accomplish the deal. It was also, Flisk testified, part of the "quid pro quo" with Medley when Medley came to the garage to "help" him when the Metropolitan fuel delivery was about to be rejected. Part of the reason for the payment of the money to Medley, Flisk explained, was to keep Medley's friendship and alliance. This adverse testimony from Flisk came from his own admissions on the stand. Flick's impeaching statements from the grand jury or plea

proceedings were not used to introduce otherwise inadmissible hearsay. The government introduced Flisk's guilty plea at trial over objection from Medley. This is an approved practice by the government so as to blunt the impact of the guilty plea on cross-examination. Flisk was of much more testimonial value to the government than merely having the jury know that Medley's cohort had pled guilty. The trial court followed up this Flisk plea evidence by giving the Pattern Seventh Circuit Jury Instruction which provides that evidence that a witness has been convicted of a crime could be considered only so far as it might affect the credibility of the witness. *See United States v. Davis,* 838 F.2d 909, 917 (7th Cir.1988). This circuit is not alone in this view.[5]

Even though we find no reversible error in the government's use of Flisk, it is very interesting to note that Medley's trial counsel ably tried to turn Flisk's testimony to Medley's advantage by showing that it was Flisk who was guilty, not Medley. On cross-examination, Medley's counsel explored other aspects of Flisk's guilty pleas ignored by the government. During that cross-examination, defense counsel secured emphatic denials from Flisk that he had "bribed" Medley. Flisk's testimony was used advantageously by Medley's counsel in closing argument to the jury and even in arguing the motion for judgment of acquittal at the close of evidence. It appears that Flisk was of great value to the government and at the same time was about all the defense Medley had, such as it was. It is unconvincing and without legal substance that on appeal the government's calling of Flisk as a witness should be regarded as reversible error. It was Medley, not the government, who chose Flisk for an accomplice. Conspirators are usually not model citizens, but the government can only gather its evidence where it finds it. This situation was well described in *United States v. Karnes,* 531 F.2d 214, 217 (4th Cir.1976):

In many cases the prosecution must depend upon the testimony of persons who are co-defendants, co-conspirators, felons, accomplices, etc., and such witnesses often evidence hostility, are impeachable from their past or current activities, or change or slant their testimony from what, based upon prior statements, the government expects them to say. Under such circumstances, a district judge may afford wide latitude to the government to lead, to cross-examine, and partially to impeach such witnesses.

In our view the government would have been derelict in its prosecutorial responsibility had it not called Flisk, the central figure as he was labeled by the trial judge, for Flisk to testify about his and Medley's unfortunate scheme. We find no error.

### B. *The Offense Instruction*

■ During Medley's first trial, the government consistently referred to the charge against Medley as "bribery," but avoided the use of that term in this trial and opposed Medley's requested jury instruction on "bribery." The trial court did not give Medley's proposed "bribery" instruction, which raises an issue that it appears to us could reasonably and fairly have been avoided by the government. The trial judge, outside the presence of the jury, characterized "bribery" as merely a "shorthand way" of explaining the statutory charge against Medley. We agree, and also agree that a "shorthand" explanation of the charge was not absolutely necessary in view of the other instructions given. The term "bribery" appears in the section caption, but not in the language actually defining the crime. The caption, however, does not control. *Brotherhood of R.R. Trainmen v. Baltimore & O. Ry.,* 331 U.S. 519, 528, 67 S.Ct. 1387, 1392, 91 L.Ed. 1646 (1947). The caption is not a part of the statutory crime definition. *Patterson v. Bark Eudora,* 190 U.S. 169, 172–73, 23 S.Ct. 821, 822, 47 L.Ed. 1002 (1903).

We note that the government's refusal to use the term "bribery" in this trial may have been motivated by an effort to mitigate Flisk's denials on cross-examination

5. *See, e.g., United States v. Henderson,* 717 F.2d 135, 137 (4th Cir.1983), *cert. denied,* 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); *United States v. Baez,* 703 F.2d 453, 455 (10th Cir.1983); *United States v. Wiesle,* 542 F.2d 61, 62 (8th Cir.1976).

that he had actually "bribed" Medley. Flisk did admit, however, that it was a "quid pro quo" situation. But whatever reason the government may have had for its opposition to the use of the term is of no consequence. The government offered an instruction which was given that set forth the offense using the language in the body of section 666. The statute is not complex. The instruction given should not have been difficult for lay jury persons to understand. That suffices.

In its opening argument, possibly anticipating Flisk's use of the term, the government informed the jury that Medley was not charged with "bribery," but "influence peddling." While the government's statement might be considered technically correct, the distinction did little to clarify the issue for the jury. The trial judge could have chosen to elaborate on the term "bribery" in a jury instruction, but using his discretion the trial judge chose not to do so. In view of the statutory definition given along with the other instructions, we see no reversible error. *See United States v. Grier*, 866 F.2d 908, 932 (7th Cir.1989).

## C. *The Issue Instruction*

■ With some justification, Medley also complains about the intent element of the section 666 issue instruction given to the jury. The section 666 offense was defined in the instruction as a prohibition against the giving or receiving of anything of value for the purpose of influencing or being influenced in connection with any business transaction or series of transactions. The instruction, however, failed to state that it all had to be done "corruptly." The term "corruptly" is the first word in section 666(a)(1)(B) defining the particular charge. It is difficult to understand why the statute was not fully and correctly tracked in the instruction when the government conceded that corruption is an aspect of the charge. The government argued to the jury that

Medley acted with "corrupt intent." In addition to urging that the instructions as a whole suffice, the government would have us, as an alternative, adopt what we regard as a strained reading of section 666. The government explains that the statute's use of "corruptly" applies only to the elements first set forth in the sentence and not to the elements mentioned in the last part of that same sentence.[6] The trial judge agreed. "Corruptly" by that reading would be an element if one is charged with soliciting or demanding anything of value intending to be influenced, but it would not be if the charge was accepting or agreeing to accept a thing of value to be influenced. "Corruptly" was viewed as modifying only the terms which immediately followed it but not the next following terms in the same sentence. We prefer to interpret this statute according to reason and not by trying to apply a grammatical rule. The government does not suggest why Congress saw some distinction in those nuances of the same offense so as to require one to be corruptly done and the other to be done with some other undefined evil intent. The government points to another part of the criminal code, 18 U.S.C. § 215(a)(2), which in using similar language repeats the term "corruptly." That is a different statute. That section may be considered more clearly written, but section 666 is clear enough.

■ Medley therefore claims that the jury was not specifically instructed in terms of corruption and that the offense requires a specific state of mind showing an intent to accomplish an illegal end by unlawful means. It is true, as Medley points out, that the jury must be instructed to find each element of the crime under the proper standard of proof. Failure to accurately define the essential elements of the offense charged is "grave" error. *United States v. Hiscott*, 586 F.2d 1271, 1274–75 (8th Cir.1978). There can be no argument

---

**6.** That sentence, also set forth in footnote two, is repeated here for convenience:

[whoever] corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more ... shall be fined under this title, imprisoned not more than 10 years, or both.

18 U.S.C. § 666.

that to omit or misstate an essential element of the crime intended to be charged is serious and possibly fatal, as in *Hiscott*. *Hiscott* involved a charge of transportation of a stolen vehicle moving in interstate commerce, but the instruction given suggested only that the stolen vehicle had at some previous time been in interstate commerce but not at the time charged. The defendant had objected to the instruction on that basis and no other instruction was found to cure the misstatement. The same is not true in the present case.

 There is more to the government's argument, however, than the unnatural reading and interpretation of the one statutory sentence at issue. The government points out that there was no objection to the instruction from Medley's counsel. Therefore, we review the omission on a plain error standard. *United States v. Douglas*, 818 F.2d 1317, 1320 (7th Cir. 1987). That requires us to determine from an examination of the entire record whether or not the defective instruction had a probable impact on the jury's finding of guilt. *United States v. Markowski*, 772 F.2d 358, 363 (7th Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986). We will reverse for plain error only when otherwise it would be a "miscarriage of justice." *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985).

But this was no ordinary plain error situation arising from a mere failure of Medley's counsel to object to the instruction which did not mention "corruptly." Medley's trial counsel actively contributed to this intent problem. Not only did Medley's trial counsel not object to the given instruction, but counsel submitted defendant's own element instruction which itself did not incorporate the term "corruptly." He urged his instruction be given and it was insofar as is relevant to this issue. Medley's instruction raised only the question whether "Medley accepted and agreed to accept" the payment, and whether "the fee or compensation paid was not a bona fide fee paid in the usual course of business."

Medley on appeal claims that what was in effect his instruction is now grave error. There is no claim that Medley's own trial counsel was guilty of rendering him ineffective assistance. The government adds to this plain error argument the fact that Medley's objection comes "only after massive public and private resources were committed to conducting this retrial." That economic argument is irrelevant to our determination of whether there has been a miscarriage of justice, or whether the error had a probable impact on the jury's verdict. The government itself contributed to some of the economic problems about which it now complains. Some waste of time and money of all concerned, including this court, could have been easily avoided. As we have mentioned, Medley would have us review various alleged acts of government prosecutorial impropriety in the total proceedings, which we declined to do. The government's economic argument would, however, reopen those irrelevant issues.

Before or during trial Medley did not object that the various indictments in which he was named also did not track the statute to include the term "corruptly." After trial, however, Medley did object to the indictments in his Motion in Arrest of Judgment and Memorandum in Support of Motion in Arrest of Judgment. Even so, the government argued the case as if "corruptly" was the standard. Any possibly adverse impact on the government's case to have fully stated the charge could only have been imperceptible.

Nor is this a case where some distinction has to be drawn between a bribe and a gratuity, which are both illegal under different parts of the statute. In practice those two charges, in which the intent involved is important, have been difficult to distinguish. *United States v. Strand*, 574 F.2d 993, 995 (9th Cir.1978); *United States v. Arroyo*, 581 F.2d 649 (7th Cir.1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 838, 59 L.Ed.2d 34 (1979); *United States v. Brewster*, 506 F.2d 62 (D.C.Cir.1974). The essential element of a section 666 violation is a "quid pro quo"; that is, whether the payment was accepted to influence and reward an official for an improper act. We

do not need to make the closer bribery-gratuity intent analysis as in this case it was either a real estate fee or it was corruption, between which there is a distinct line. The instruction given, even without using the word "corruptly," would not permit a finding of guilt on some gratuity or real estate fee analysis. In *United States v. Isa*, 452 F.2d 723, 725 (7th Cir.1971), we found nothing in the amendment of a prior bribery section adding the word "corrupt" to enlarge the meaning of the intent element of the offense of bribery of public officials.

The jury was instructed that to find Medley guilty he had to be found beyond a reasonable doubt to have accepted the $25,000 from Flisk intending to be influenced or rewarded in connection with the problem between Metropolitan and the CTA. The jury was specifically admonished that Medley could not be found guilty, however, if the $25,000 he received was a bona fide fee paid in the usual course of business. No normal reasonable jury could have misunderstood what the indictment charge was about and what was required to find the defendant guilty. Corruption was argued to the jury. Quid pro quo was argued to the jury based on the explicit quid pro quo testimony of Flisk. Flisk mislabeled what he paid Medley as not being some form of bribery, but Flisk made it plain that the substantial down payment to Medley through the warehouse transaction was to induce Medley and reward him for trying to help Flisk save his valuable contract with the CTA. The jury was told that it had to find that Medley accepted or agreed to accept the payment intending to be influenced or rewarded in the performance of his official duties. That is plain, simple, and adequate. The evidence shows Flisk got what he paid for from Medley. Medley did his best to earn the illegal payments from Flisk. "Corruptly" in the context of these factual circumstances was self-defining. The use of the word "corrupt" was not critical for the jury to understand that Medley was paid for improper actions on behalf of Flisk. That is bribery and corruption, nothing else—as the trial judge said it was—"shorthand bribery." The way the word "corruptly" was used or not used does not justify a reversal.

### D. *Medley's Acquittal Motions*

Finally, Medley argues that the district court erred in denying his motions for acquittal at the close of all the evidence and again when a similar motion was made after conviction. He claims that even when construed most favorably to the government, the evidence was insufficient to prove him guilty beyond a reasonable doubt. *United States v. Marquardt*, 786 F.2d 771, 780 (7th Cir.1986).

Medley concedes that the government proved some things, including that he got the money and that he interceded with the CTA for Flisk. Medley argues, however, that he actually accepted nothing of value from Flisk intending to be influenced and rewarded in connection with his official duties. Medley argues that the check came not from Flisk, but through Medley's accountant from the lawyers selling the warehouse to Flisk. The payment and Medley's actions to assist Flisk are apparently viewed as unrelated. That unrealistically distorts the evidence.

It is apparent from merely reviewing the facts that we have set forth that the warehouse transaction had some legitimate aspects, but so far as Medley was concerned it was a timely, useful, and apparently risk-free subterfuge to receive the influence and reward money from Flisk under what would appear to be a legitimate overlay. It likely looked to Medley like a most fortunate and timely culmination of circumstances to permit him to safely enrich himself by misuse of his office. A wise jury, however, saw through the Medley–Flisk subterfuge. To weigh the evidence and judge the credibility of the witnesses is the responsibility of the jury, and that is where we shall leave it.

Medley's appellate counsel has said everything that could possibly be said in Medley's behalf, but we are constrained to find that the conviction must stand.

AFFIRMED.