1 F.3d 1244
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Howard C. MEDLEY, Sr., Petitioner/Appellant,
v.
UNITED STATES of America, Respondent/Appellee.
 No. 92-2833.
 United States Court of Appeals, Seventh Circuit.
 Argued July 8, 1993.
Decided Aug. 2, 1993.
 
 Before CUDAHY and KANNE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 
 ORDER
 
 1
 A jury convicted Howard Medley of accepting a $25,000 check from a contractor with the intent to be influenced in his duties as a board member of the Chicago Transit Authority, in violation of 18 U.S.C. Sec. 666. Medley appealed his conviction to this court, and we affirmed. United States v. Medley, 913 F.2d 1248 (7th Cir.1990). He then filed a petition to vacate his sentence, 28 U.S.C. Sec. 2255, claiming that his trial counsel was ineffective and that the Supreme Court's recent decision in McCormick v. United States, 111 S.Ct. 1807 (1991), requires the court to overturn his conviction. We affirm.
 
 
 2
 At the threshold we must decide if this case is moot. Both parties argued that this case was not moot, therefore the issue need not detain us long. "[A] criminal case is moot only if it is shown that there is no possibility that any collateral legal consequences will be imposed on the basis of the challenged conviction." Sibron v. New York, 392 U.S. 40, 57 (1968); Carafas v. LaVallee, 391 U.S. 234, 237-38 (1968); but see Lane v. Williams, 455 U.S. 624, 632 (1982) (no collateral legal consequence arose because "employment prospects, or the sentence imposed in a future criminal proceeding, could be affected"); Wickstrom v. Schardt, 798 F.2d 268, 270 (7th Cir.1986) (per curiam) (effect of conviction on reputation is not a collateral legal consequence); cf. Maleng v. Cook, 490 U.S. 488, 492 (1988) (per curiam) (petitioner is no longer "in custody" as required by the habeas statute just because there is a possibility of a future sentence being enhanced by a prior conviction, the sentence of which has been fully served). In D.S.A. v. Circuit Court Branch 1, this court noted "that a criminal record that might affect a later sentence is a sufficient collateral consequence to save an appeal from mootness." 942 F.2d 1143, 1149 (7th Cir.1991) (citing Evitts v. Lucey, 469 U.S. 387, 391 n. 4 (1985)). D.S.A. requires that we find that this case is not moot.
 
 
 3
 Medley has raised on appeal the same two issues that he raised before Judge Kocoras: 1) That his trial counsel made such poor decisions that his performance violated Medley's constitutional right to effective assistance of counsel, and 2) that in light of McCormick v. United States, 111 S.Ct. 1807 (1991), this court should overrule his conviction. We have reviewed the district court's thorough opinion, which addressed these claims thoroughly and accurately. We AFFIRM for the reasons set forth in that opinion, which is attached.
 
 ATTACHMENT
 
 4
 UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF ILLINOIS
 
 EASTERN DIVISION
 
 5
 UNITED STATES OF AMERICA, Petitioner,
 
 
 6
 v
 
 
 7
 HOWARD C. MEDLEY, SR., Respondent.
 
 
 8
 Nos. 88 CR 297-3, 92 C 1062.
 
 MEMORANDUM OPINION
 CHARLES P. KOCORAS, District Judge:
 
 9
 This matter is before the Court on defendant's habeas petition to vacate a sentence pursuant to 28 U.S.C. Sec. 2255. For the reasons set forth below, we deny the petition.
 
 BACKGROUND
 A. Procedural History
 
 10
 Howard Medley ("Medley"), petitioner, along with eight other defendants were first indicted in April 1988. The indictment arose out of the Chicago Transit Authority's ("CTA") relationship with Metropolitan Petroleum Company (Metropolitan), a privately owned motor fuel supplier. Medley was a CTA board member. Also indicted were Metropolitan and Brian Flisk ("Flisk"), an officer of Metropolitan.
 
 
 11
 Medley was indicted for perjury and accepting a thing of value with the intent to be influenced or rewarded in violation of 18 U.S.C. Sec. 666.[1] Medley's initial trial lasted eleven days, and after three days of deliberation, the jury was deadlocked, and a mistrial was declared.
 
 
 12
 Subsequently, a superseding indictment was returned, again charging Medley with violating section 666. At Medley's second trial, Flisk testified as a government witness. In between Medley's first and second trial, Flisk pleaded guilty to a number of related charges. Medley's second trial lasted six days. Medley neither testified, nor presented any meaningful evidence on his behalf. Medley was represented by different counsel at his second trial. After its deliberations, the jury concluded that Medley was guilty of accepting and agreeing to accept $25,000 from Flisk with the intent to be influenced and rewarded in his duties as a CTA board member. Accordingly, Medley was sentenced to thirty months in jail and fined $10,000.
 
 
 13
 Although Medley raised three issues on appeal,[2] the Seventh Circuit affirmed his conviction. Medley was paroled on December 5, 1990. He is presently living in Chicago and is under the supervision of the United States Probation Service. Medley's sentence expires on September 20, 1992.
 
 B. Factual Background[3]
 
 14
 In October, 1986, Flisk ran Metropolitan. At that time, the company entered into two, two-year contracts with the CTA to be its exclusive supplier of diesel fuel. These contracts were valued at $38 million and were Metropolitan's most important contracts. Flisk obtained the fuel contracts by representing that the CTA would receive substantial discounts if it paid its bills within specified time periods. Flisk also agreed to meet the CTA's Minority Business Enterprise requirement by specifying Casey Fuels as a minority-run subcontractor that would deliver part of Metropolitan's fuel to the CTA.
 
 
 15
 Contrary to Flisk's belief, the CTA paid its bills promptly. As a result, Metropolitan began losing money at a "devastating" rate. To combat these losses, Flisk began sending the CTA late or fraudulently inflated invoices. The CTA's Internal Audit division became suspicious and began investigating Metropolitan in late November and early December of 1986. Flisk learned of this investigation in January, 1987 and feared that Metropolitan would go out of business if the CTA cancelled its contracts.[4]
 
 
 16
 At or around this time, in late January or early February, Medley, while acting as a CTA board member, learned from his longtime lawyer friend, Robert Sperling, that he and other individuals who owned a large commercial warehouse were desperately looking for a buyer and that a substantial commission would be paid to anyone who could find such a party.
 
 
 17
 While Medley was keeping an eye out for such a buyer, Flisk turned to Medley for assistance in connection with the CTA's investigation of Metropolitan. Howard Weitzman ("Weitzman"), Flisk's personal friend and Metropolitan business partner, arranged a meeting in Medley's CTA office. Later, Medley, Flisk, and Weitzman had a second meeting which ended up at Medley's apartment. At the apartment meeting, Flisk and Medley discussed CTA matters, Metropolitan's fuel contract, and Medley's needed assistance with Metropolitan's "problem." According to Flisk's testimony, Medley also suggested that Flisk purchase Sperling's warehouse. Flisk learned that Medley stood to gain a $300,000 commission if he located a buyer for the building. According to Flisk, he was willing to pay this commission because Medley was "helping" him with the CTA investigation. Indeed, at trial, Flisk referred to the warehouse commission as the "quid pro quo" for Medley's help.
 
 
 18
 After the apartment meeting, Medley called Sperling and informed him that he knew of an individual interested in the warehouse. Upon Medley's recommendation, Flisk and Weitzman examined the property, and negotiations with Sperling and his partners for the sale or lease of the warehouse began soon thereafter.
 
 
 19
 While negotiations continued, on February 20, 1987, the CTA's Audit division disseminated the results of its investigation of Metropolitan to CTA board members. The report criticized Metropolitan's tardy billings and questioned the validity of Casey Fuels as a legitimate minority enterprise.
 
 
 20
 Subsequently, at a public board meeting on March 4, 1987, board member John Hoellen cited the Audit report as support to terminate Metropolitan's contract. In response, Medley spoke out about a conversation he said he had had about the report with the CTA's purchasing agent, Ed Tobin. Tobin, however, denied that he had spoken to Medley about the report. These conversations ceased when potential litigation with Metropolitan was mentioned. The investigation was then referred to the CTA Purchases and Sales Committee for a report back to the board.
 
 
 21
 Natalia Delgado ("Delgado") chaired the CTA's Purchases and Sales Committee. During a ten minute intermission between open and closed board meetings on March 4, 1987, Medley approached Delgado. Medley informed Delgado that Casey Fuels was actually getting ready to deliver fuel and that unknown persons were "out to get Metropolitan because they didn't like minority subcontracts."
 
 
 22
 Two days later, Medley called the CTA affirmative action staff head Larry Murphy ("Murphy") into his office. When Murphy arrived, Flisk and Clarence Casey, owner of Casey Fuels, were present. Medley told Murphy to prepare a report proving that Casey Fuels was in fact participating in the Metropolitan contract. When Murphy replied that he had no information to substantiate such a claim, Medley directed Casey and Flisk to provide the necessary information.
 
 
 23
 Immediately after speaking with Murphy, Medley called CTA senior staffer and purchasing agent Tobin into his office. When he arrived, Medley, Flisk, Casey, and Murphy were all present. Medley informed Tobin that he was looking into the minority subcontractor and invoicing allegations in the Audit report. Tobin warned Medley not to discuss the matter in front of the subjects of the investigation because of the possibility of future litigation. Tobin was so disturbed by Medley's conduct that he immediately went to the CTA staff chairman and wrote a memo detailing what had occurred in Medley's office.
 
 
 24
 A week later, Medley, again in the presence of Flisk and Casey, gave Murphy a stack of papers from Flisk and told Murphy to "go back and take care of the minority." A week later Medley called Murphy into his office regarding Murphy's report. Murphy informed Medley that the papers were irrelevant, and therefore no report was written. Medley responded, "O.K. That's all." Medley never informed the CTA board that Metropolitan and Casey's evidence on the minority issue was meritless.
 
 
 25
 On March 17, 1987, Internal Audit issued a second critical report of Metropolitan. This report expressed concern over the quality of diesel fuel tested from Metropolitan's trucks. On March 19, 1987, CTA employees were told to visually examine Metropolitan's fuel for particles and water. On that day, Byron Harvey took a fuel sample from a Metropolitan delivery truck. After examining the sample, Harvey brought it to his supervisor, Terry Short. Short agreed with Harvey that the sample looked too light and cloudy and therefore should be rejected. By the time these individuals returned to the Metropolitan fuel truck, however, Flisk had arrived. Additionally, within minutes of Flisk's arrival, Medley was on the scene. Flisk admitted to calling Medley to assist him at the garage. Additionally, both Harvey and Short testified that they had never seen Medley at the garage either before or since that time.
 
 
 26
 While at the garage, Medley initially spoke to Flisk. He then approached supervisor Short who informed Medley that the fuel sample was taken from Metropolitan's truck. Medley informed Short that the fuel looked acceptable to him. Consequently, Short accepted the delivery.
 
 
 27
 On the same day, Medley also called Delgado at her law firm. Medley told her that Casey Fuels was delivering the fuel and that fuel samples were erroneously being taken from underground tanks, not delivery trucks. Delgado testified that the call was unusual because Medley had never, except one time before, called her at her firm to discuss substantive board matters. During this conversation, Medley also arranged a personal meeting with Delgado for the next day to discuss the Metropolitan issue. Delgado, however, canceled this meeting because of an emergency legal matter at her office. Immediately after hanging up with Delgado, Medley called Sperling. Phone records for the remainder of the day showed numerous calls between Medley and Flisk, Medley and Sperling, Flisk and Sperling, and Medley and John Wilson, Medley's accountant who later accepted a $25,000 check from Flisk delivered to him by Weitzman for Medley.
 
 
 28
 Five days later, on March 24, Medley called Delgado at her office again. This was the day before a scheduled CTA Purchases and Sales Committee meeting. Medley again told Delgado that Casey Fuels was in fact delivering fuel under the contract. Delgado testified that Medley further informed her that he had gone to examine water seepage at the CTA's underground fuel tanks and that the Metropolitan fuel quality samples were inaccurate because they were being taken from water soaked fuel tanks, not Metropolitan fuel trucks. Medley also told her that people were "out to get Metropolitan Petroleum." Medley did not tell Delgado that he had gone to the garage the previous week at Flisk's behest, that the sample at the garage was taken from a Metropolitan truck, or that there was no water over the fuel tanks at that time.
 
 
 29
 The next day, March 25, 1987, the Purchases and Sales Committee met to discuss whether to recommend the termination of Metropolitan's contract. Delgado reported what Medley had told her about Casey Fuels delivering the fuel and offered Medley's explanation for the questionable fuel quality samples. Based on this and other information, the committee recommended against termination.
 
 
 30
 Around this time, late March, 1987, Medley had a conversation with Sperling's partner, Michael Zavis. Zavis told Medley that the real estate partnership could not afford to pay Medley any commission on the warehouse deal but that Zavis would negotiate with the buyers, Flisk and Weitzman, to pay it. Zavis informed Medley that he would get one-half of the commission and that Zavis and Sperling would receive one-quarter each. Soon thereafter, Zavis had a meeting with Flisk during which Flisk agreed to pay a $300,000 commission.
 
 
 31
 In late March, the deal was ready to be consummated. Sperling, however, called Medley and informed him that only licensed real estate brokers could receive a real estate commission. Because Medley was not a licensed broker, Sperling suggested that Medley either: (1) designate a real estate broker to accept his share as a favor; (2) designate a charity to be paid his share; or (3) request that his share be paid as a political contribution. Medley replied that he wanted to consider the matter. A short time before March 31, 1987, Medley called Zavis and told him that John Wilson ("Wilson") was to receive Medley's commission of $150,000. Zavis called Wilson, learned that he was a licensed real estate broker, and provided his name to Flisk's attorney so that the commission check could be made out correctly.
 
 
 32
 Around this time, Medley met with Wilson regarding the commission. Wilson was Medley's accountant. Medley told Wilson that he had earned a fee in a real estate transaction but that the parties involved "were balking about it" because they wanted a licensed real estate broker "to accept the money." Medley then told Wilson that he wanted Wilson to accept the money for him. With Medley present, Wilson called his attorney regarding Medley's suggestion. Wilson's attorney advised them that Wilson could not share a commission with a nonlicensed broker. The lawyer, however, said that he would get back to them about the possibility of sharing the money if it were characterized as a finders fee. The lawyer never got back to Wilson, and Wilson and Medley had no further conversations regarding the legality of sharing the commission.
 
 
 33
 While the real estate deal was drawing closer to completion, the CTA's board held a closed meeting on April 1, 1987 to discuss the allegations surrounding Metropolitan. Delgado reported that her committee had recommended against termination based on the same information that Medley had provided her. Medley also spoke at this meeting in support of Metropolitan. In so doing, however, Medley made a number of misrepresentations. Medley lied that he had gone out to the CTA garage and found a foot of standing water around the underground fuel tanks. He also lied when he stated that the fuel samples came from the underground tanks, not Metropolitan's delivery trucks. Moreover, at no time during this meeting did Medley inform the board about his conduct on behalf of Flisk, Weitzman, or Casey or the real estate transaction. At the end of the meeting, the board voted against terminating Metropolitan's contracts.[5]
 
 
 34
 On April 10, 1987, Medley met with Sperling. At this time, Medley agreed that Wilson should take six monthly installments of $25,000 for the real estate deal. Subsequently, shortly before April 14, Medley told Wilson that a man named Weitzman would be bringing over a $25,000 check for Medley. After Wilson received the check on April 14, Medley instructed Wilson to keep $2,500 for himself and send him the remaining $22,500.
 
 
 35
 In early July, 1987, the CTA terminated Metropolitan's contract for fraud. In April 1988, Medley was required to file an economic interest statement with Cook County for 1987 listing "any kind of payment from anyone having a contract or doing business with the CTA." Medley did not list the $22,500 payment from Flisk. Medley, however, did list a $22,500 "finders fee" on his income tax return filed at about the same time with the Internal Revenue Service, but the source of the fee was not shown. Subsequent events led to Medley's indictment and ultimate conviction.
 
 
 36
 Medley has now filed this petition to vacate his sentence pursuant to 28 U.S.C. Sec. 2255. Medley's bases for this petition is two fold. Medley's first argument is that he was a victim of ineffective assistance of counsel. In support of this claim, Medley highlights a myriad of purported errors. Secondly, Medley argues that the recent Supreme Court decision of McCormick v. United States, 111 S.Ct. 1807 (1991), requires vacating his sentence. We address these arguments below.
 
 DISCUSSION
 A. Ineffective Assistance of Counsel
 
 37
 Medley's initial argument in support of vacating his sentence is that he was deprived of his constitutional right to effective assistance of counsel at his second trial. Medley makes numerous arguments in support of this claim. We address each argument below. However, because we find these positions meritless, we deny Medley's ineffective assistance argument.
 
 
 38
 The Sixth Amendment guarantees that criminal defendants will receive effective assistance of counsel. This constitutional right, however, in no way ensures defendants with the best possible defense. Strickland v. Washington, 466 U.S. 668, 697 (1984) (acknowledging that the "object of an ineffectiveness claim is not to grade counsel's performance"). Rather, the underlying goal is to ensure that a defendant receives a fundamentally fair trial. Id. at 686 & 696. A fair trial is "one in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding." Id. at 684. As the Supreme Court has recognized, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.
 
 
 39
 It is in light of this underlying rationale that we must analyze any claim of ineffective assistance of counsel. As such, the defendant has a heavy burden in demonstrating ineffectiveness. United States v. Balzano, 916 F.2d 1273, 1292 (7th Cir.1990) (acknowledging that defendant "must climb" a "high mountain" to succeed on ineffectiveness claim); United States v. Moya-Gomez, 860 F.2d 706, 763 (7th Cir.1988) (acknowledging that the "defendant bears a heavy burden"), cert. denied, 492 U.S. 908 (1989). Specifically, the defendant must show that his counsel's performance was deficient and that this deficient performance prejudiced the defense. Strickland, 466 U.S. at 687. Prejudice exists if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.[6] Id. at 694.
 
 
 40
 It is unnecessary to examine the first prong of the ineffective assistance test, the reasonableness of counsel's performance, if counsel's conduct caused the defendant no meaningful prejudice. Id. at 697 (acknowledging that a court "need not determine whether counsel's performance was deficient ... [i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often" be the case). With these principles in mind we will address each of Medley's arguments in support of his claim of ineffectiveness.
 
 
 41
 Medley's first argument is that the "government significantly changed its theory of the case between the first and second trials" and that his trial counsel failed to appreciate this change in strategy. Specifically, Medley maintains that the government's focus at the first trial was on "bribery" while at the second trial "the government abandoned the bribery claim and characterized Medley's conduct as 'influence peddling.' " Medley insists that this misapprehension and fixation on bribery constituted ineffective assistance of counsel.
 
 
 42
 Even if there were a meaningful distinction between bribery and section 666, Medley has failed to present any particularized example prejudice. Initially, we note that we are not convinced that for purposes of Medley's trial there is a meaningful distinction between bribery and section 666. Medley contends that section 666 requires a showing of a quid pro quo, whereas bribery does not. However, this distinction is incorrect. See 18 U.S.C.A. Sec. 201(b)(2) (public official takes a bribe when he "corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally ... in return for, [inter alia ], being influenced in the performance of any official act") (emphasis added); Federal Criminal Jury Instructions of the Seventh Circuit, Vol. III, at 20 (West 1986) (rendering it an unlawful act of bribery for public official to "receive anything of value for his official services from any source other than" the United States government) (emphasis added); see also Illinois Pattern Jury Instructions, 21.11 (West 2d 1981). Additionally, the Seventh Circuit agreed with our earlier conclusion that "bribery" is merely a " 'shorthand' explanation of the [section 666] charge." Medley, 913 F.2d at 1258. Thus, we see no valid distinction between the two statutory offenses for purposes of Medley's trial. However, even if Medley's distinction were valid, he has failed to articulate any particular act that his trial counsel would have done differently had he "properly" understood the nature of the charged crime.[7] Accordingly, Medley has failed to demonstrate any prejudice. Therefore, this argument fails to support Medley's claim of ineffectiveness.
 
 
 43
 Medley's second argument is that his trial counsels' failure to object to the government's jury instruction regarding the section 666 offense constituted ineffective assistance of counsel. Specifically, Medley contends that the instruction failed to inform the jury that a section 666 violation only arises if the thing of value was accepted with a "corrupt" intent. Medley maintains that had the jury been informed as to the statute's mental state requirement, it would have found Medley innocent.
 
 
 44
 Medley previously raised this issue on appeal, and the Seventh Circuit rejected it. The court held that the absence of the language "corruptly" from the jury instruction did not have "a probable impact on the jury's finding of guilt" and did not amount to "a miscarriage of justice." Id. at 1260. In so holding, the court reasoned that "[n]o normal reasonable jury could have misunderstood what the indictment charge was about and what was required to find the defendant guilty." Id. at 1261. The court further reasoned that Medley's receipt of money was "either a real estate fee or it was corruption" and that the "instruction given, even without using the word 'corruptly,' would not permit a finding of guilt on some gratuity or real estate fee analysis." Id. We agree with the Seventh Circuit's reasoning. Therefore, it necessarily follows that Medley incurred no meaningful prejudice as a result of counsels' failure to object to the government's jury instruction within the meaning of the Sixth Amendment. Accordingly, Medley's jury instruction argument in support of his ineffectiveness claim must also fail.
 
 
 45
 We reject Medley's argument that his trial counsel committed ineffective assistance of counsel because their errors caused the Seventh Circuit to review the jury instruction issue under a stricter plain error standard. The Seventh Circuit did, in fact, apply a stricter standard of review because of counsel's failure to object to the government's jury instruction and their submission of jury instructions without the "corruptly" language. Id. at 1260. Medley insists that had his counsel properly objected to the government's proffer, the Seventh Circuit would have used a less strict standard of review and ultimately would have found in favor of Medley on this issue.
 
 
 46
 Medley's argument must fail for two reasons. Initially, we note that Medley's position is rife with speculation. It assumes that the government would have objected to the "corruptly" language. This is questionable. Indeed, the Seventh Circuit, on appeal, recognized that the government in fact "argued the case as if 'corruptly' was the standard." Id. at 1260. Moreover, even if the government did object, Medley's position further assumes that we would have rejected Medley's objection. We will not engage in such speculation. Secondly, and more important, is that Medley's argument misses the point. The critical question is whether counsel's errors caused meaningful prejudice with respect to the jury's verdict. The Seventh Circuit and this Court have already concluded that the instruction in question caused no such prejudice. Medley's argument, therefore, is misplaced and rejected.
 
 
 47
 Medley's third argument in support of his petition is that his trial counsel made "[s]erious errors ... with respect to at least ten witnesses who testified at Medley's second trial." Specifically, Medley argues that his counsel "did not ask questions which were asked at [his first trial] and which when asked resulted in answers favorable" to him.
 
 
 48
 Before addressing those specific points that Medley makes in support of this argument, we make some preliminary observations. Initially, we note that Medley's counsel at the second trial was not obligated to try Medley's case in the same fashion as counsel did for his first trial. See Strickland, 466 U.S. at 689 (acknowledging that there are "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way"). Indeed, to do so would have been problematic since Medley's first trial resulted in a hung jury, not acquittal, and that was in the absence of Flisk's important testimony for the government. In light of this caveat, we will address the particular lines of testimony that Medley contends deprived him of a fair trial whose result is unreliable.
 
 
 49
 Medley's initial argument is that numerous individuals could have testified that Medley's "interaction with Board Members regarding Metropolitan Petroleum was not unusual" and indeed "did not go beyond the point of asking questions, raising issues, and advocating a position." In support of these contentions, Medley states that Mr. Paalswell, CTA's executive director, and Mr. Hillman would have testified that Medley never approached them about Metropolitan. With respect to Delgado, Medley asserts that she could have testified that he "did not go beyond offering her information." As to Murphy, Medley argues that he could have testified that Medley "did not push the issue [the minority status of Casey Fuels] after Murphy stated that he didn't think Metropolitan's data was sufficient." Finally, Medley maintains that Short would have testified that Short accepted the disputed fuel delivery after Medley reminded him of the latest memo covering standard testing procedures requiring lab testing.
 
 
 50
 We reject these contentions because the failure to elicit this testimony did not in any meaningful way prejudice Medley. With respect to Paaswell and Hillman, we note that evidence of Medley's inaction has little, if any, probative value. Medley's failure to solicit all board members on Metropolitan's behalf in no way mitigates those questionable actions that he did take. Moreover, Medley badly mischaracterizes the nature of his conduct with Delgado. Medley did more than "offer her information." Indeed, he engaged in a preconceived plan of deception and solicitation. Medley never informed her as to his vested interest in Metropolitan's negotiations for the commercial warehouse. He never informed her that Metropolitan had no credible evidence of Casey Fuels' minority status. He also lied when he stated that Metropolitan's fuel samples were erroneously being taken from underground fuel tanks that were submerged under a foot of water. Nor did Medley tell Delgado that he had gone to a CTA garage at Flisk's behest, that the sample at the garage was taken from the Metropolitan truck, or that there was no water over the fuel tanks at that time. Additionally, the fact that Medley did not push Murphy regarding the Casey Fuels issue, again evidence of Medley's inaction, would have had little if any influence on the jury. Furthermore, as to Short's acceptance of the fuel delivery, Medley has failed to submit the alleged memo. However, even if it did in fact exist, evidence of Medley's other actions on behalf of Metropolitan were more than sufficient for a reasonable jury to convict him. Therefore, because Medley has failed to make the requisite showing of prejudice with respect to this testimony, we reject his reliance on it.
 
 
 51
 Medley's second contention is that his counsel erred by not eliciting testimony that demonstrated the legitimacy of the real estate transaction. This was not error because the government conceded this fact at Medley's second trial. Therefore, no meaningful prejudice arose.
 
 
 52
 Medley's third contention turns on testimony regarding Medley's acceptance of his "fee." Medley insists that: (1) the idea of the real estate commission was not his; (2) Medley was not involved in the decision to pay him a fee; (3) Medley "was reluctant to accept a fee and rejected the notion on several occasions"; (4) Medley believed the fee came from Sperling and Zavis not Flisk; and (5) Sperling, Zavis, and Wilson thought the fee was legitimate.
 
 
 53
 Medley's first and second points, that Sperling would have testified that it was his "original idea" to pay a fee to Medley and that "Medley had no part in the negotiations nor in the decision to include him in the fee payment," would not have changed the jury's decision. Medley ignores the important testimony that he knew, because of his prior discussion with Sperling, that a substantial commission could be made, and he knew this fact when he suggested the deal to Flisk. Thus, there was no constitutional error in failing to elicit this testimony.
 
 
 54
 Medley also argues that he was reluctant to accept any fee and turned it down numerous times. Medley does not suggest who would have testified to this fact. Moreover, Medley himself chose not to testify. Furthermore, the fact of the matter is that Medley did accept the fee, and the evidence established that he was keenly interested in obtaining it. Medley actively defended Metropolitan in addition to having numerous communications with Sperling and Zavis regarding the state of negotiations. Moreover, Medley also rejected three alternatives which Sperling suggested for Medley's disposition of the money. Indeed, Medley rejected these alternatives in the face of Wilson's attorney's equivocal statement as to the legality of such an enterprise. Therefore, it is doubtful that the jury would have deemed Medley's suggested testimony as credible or persuasive.
 
 
 55
 Medley also contends that his trial counsel should have elicited testimony regarding Medley's belief that the fee came from Zavis and Sperling, not Metropolitan. Initially, we note that there was testimony to the contrary. Additionally, in order to elicit such testimony, Medley would have had to take the stand. As discussed below, there were substantial risks in this, and it was proper to recommend against doing so.
 
 
 56
 Moreover, the fact that "neither Zavis nor Sperling, both attorneys, saw anything improper about Medley receiving a fee" for his help is irrelevant. Furthermore, these individuals were unaware of Medley's efforts on behalf of Metropolitan. This is equally true of Wilson. Therefore, trial counsels' failure to elicit this testimony from these individuals regarding their belief as to the propriety of their dealings caused Medley no meaningful prejudice. Accordingly, trial counsels' failure to present the above-mentioned testimony regarding Medley's acceptance of his "fee" did not amount to a constitutional error.
 
 
 57
 Medley's alternative and final point regarding his counsels' failure to elicit favorable testimony at trial turns on Flisk's testimony. Medley claims that his counsel was ineffective by not playing a secretly recorded conversation between Flisk and a confidential informant, in which Flisk allegedly stated that Medley asked for no money and that no money was paid in return for any action on Medley's part. Evidence of this taped conversation, however, would not have exonerated Medley because it was merely cumulative evidence to Flisk's own testimony. At trial, Flisk repeatedly stated that he did not pay a bribe to Medley. Moreover, to the extent that the taped conversation suggests that Flisk thought the payments were not a quid pro quo, that is belied by Flisk's grand jury testimony. Furthermore, Medley contends that Flisk's "quid pro quo" comment merely meant that Flisk hoped that Medley would act on his behalf. Counsels' failure to elicit this testimony from Flisk is insufficient to give rise to an ineffective assistance claim. Initially, we note that Medley has not filed any affidavit from Flisk indicating that he would have in fact so testified. Moreover, Flisk's post hoc explanations on cross examination of what he meant by such legal terms as "bribery" and "quid pro quo" would have likely been viewed by the jury as biased and questionable at best. Therefore, no meaningful prejudice arose.
 
 
 58
 Medley's fourth argument in support of his petition is that his trial counsel seriously erred by failing to object to the government's use of Flisk's plea agreement and plea colloquy to impeach Flisk at trial. Medley raised this exact issue on appeal, and the Seventh Circuit rejected it. In addressing the issue, however, the Seventh Circuit noted that Medley's trial counsel only objected to the government's use of Flisk's proffer to an FBI agent in 1987 and not to the government's use of Flisk's plea agreement or plea colloquy. Accordingly, the court analyzed the issue under a plain error standard. Medley now contends that his "appeal would have been successful" had his attorneys properly objected because the Seventh Circuit would have employed a less stringent standard of review as to the propriety of Flisk's impeachment.
 
 
 59
 Although Flisk was a government witness, the government could properly impeach his testimony if done in good faith. United States v. Webster, 734 F.2d 1191, 1192 (7th Cir.1984). Accordingly, government impeachment is impermissible only if it is merely governmental subterfuge to get before the jury evidence otherwise not admissible. Id. We reject Medley's argument because there is no evidence in the Seventh Circuit's opinion or elsewhere in the record that the government engaged in any bad faith in calling Flisk to testify or by asking him questions which ultimately led to his impeachment. Indeed, the opposite appears to be the case. Medley, 913 F.2d at 1257-58. Nor did the government seek to admit otherwise inadmissible evidence. Id. Therefore, Medley's argument that he would have prevailed on appeal had his counsel objected to the government's use of Flisk's plea and plea colloquy is simply insupportable. Accordingly, there was no meaningful prejudice in failing to object.
 
 
 60
 Medley's fifth argument in support of his petition is that his attorneys made a critical error in advising him not to testify. Medley makes the bolder statement in his affidavit that his counsel did "not allow[ ]" him to testify. With respect to this latter contention, we find it preposterous to believe that Medley's attorneys' coerced him to not testify. Medley himself stated before this Court that, "it is my decision [to not testify] because I felt there was no evidence. So, I felt there wasn't a need to testify." Moreover, there would be no reason for Medley's attorneys to coerce their client. Therefore, we reject this argument as entirely meritless.
 
 
 61
 It is equally fallacious to contend that counsel's advice not to testify constituted ineffective assistance. The Seventh Circuit has recognized that defense counsel's decision not to put his client on the stand is a "classic example of what might be considered sound trial strategy." United States v. Norwood, 798 F.2d 1094, 1100 (7th Cir.), cert. denied, 479 U.S. 1011 (1986). Indeed, had Medley testified, the government could have admitted damaging evidence to impeach Medley's credibility or expose him to perjury charges, both very real possibilities. Accordingly, Medley's attorneys could have reasonably concluded that his testimony would have done more harm than good to the defense. Their recommendation against testifying, therefore, did not constitute ineffective assistance of counsel.
 
 
 62
 Finally, defense counsels' failure to present any evidence on behalf of Medley did not constitute ineffective assistance. It is not per se ineffective assistance to put on no defense at all. United States v. Ramsey, 785 F.2d 184, 194 (7th Cir.), cert. denied, 476 U.S. 1186 (1986). Medley's counsels' cross-examination of numerous governmental witnesses, and Flisk in particular, provided a sufficiently meaningful adversarial testing of the government's case. See Medley, 913 F.2d at 1258 (lauding counsel's cross-examination of Flisk as "about all the defense Medley had"). Moreover, as discussed above, there is no reasonable likelihood that Medley's jury would have altered its verdict had defense counsel presented the evidence that Medley now contends should have been admitted. This desired evidence would have been of minimal probative value, or insufficient to outweigh the government's substantial evidence, or, indeed, harmful to the defense. Accordingly, no meaningful prejudice arose.
 
 
 63
 In sum, we have reviewed those purported errors that Medley contends constituted ineffective assistance of counsel. Neither individually nor collectively did these alleged errors meaningfully prejudice Medley. Rather, Medley received a fundamentally fair trial upon which a reliable result was obtained. The Sixth Amendment requires no more, and therefore Medley's ineffective assistance claim must fail.
 
 B. Impact of McCormick v. United States
 
 64
 Medley's alternative argument is that McCormick v. United States, 111 S.Ct. 1807 (1991), requires vacation of his sentence. McCormick involved the indictment of a state legislator under the Hobbs Act for extortion. During his tenure, this state legislator made an agreement with a lobbyist to sponsor state legislation regarding unlicensed doctors. McCormick, 111 S.Ct. at 1809-10. During his reelection campaign, this state legislator informed the lobbyist that his reelection campaign was expensive and that he had not heard from the doctors. Id. at 1810. Subsequently, before and after the law in question was enacted, the state legislator received numerous cash payments. Neither the legislator nor the doctors' association reported the cash payments as campaign contributions.
 
 
 65
 The Supreme Court vacated the legislator's Hobbs Act conviction for extortion. Id. at 1818. In so doing, the Court stated that a conviction under the Hobbs Act for extortion requires "proof of a quid pro quo, i.e., a promise of official action or inaction in exchange for any payment or property received." Id. at 1813 & 1816-17. Medley contends that this same reasoning applies to a section 666 violation and that the government failed to prove that a quid pro quo situation existed or, in other words, that Flisk made any payment "in return for an explicit promise or undertaking" by Medley.
 
 
 66
 The Court's decision in McCormick does not compel the vacation of Medley's conviction. McCormick is both legally and factually distinguishable from Medley's case. McCormick involved the Hobbs Act, not a violation of 18 U.S.C.A. Sec. 666. Additionally, the Court expressly limited its holding to campaign contributions. Id. at 1817 n. 10. More importantly, however, even if the principles articulated in McCormick applied, Medley's argument fails on the merits.
 
 
 67
 Unlike the lower court's conviction in McCormick, Medley's jury properly focused on the quid pro quo requirement. The Seventh Circuit acknowledged that the "essential element of a section 666 violation is a 'quid pro quo'; that is, whether the payment was accepted to influence and reward an official for an improper act." Medley, 913 F.2d at 1260. Moreover, we agree with the Seventh Circuit that the jury understood section 666's requirements. Id. at 1261 (finding that "[n]o normal reasonable jury could have misunderstood what the indictment charge was about and what was required to find the defendant guilty"). Additionally, quid pro quo was argued to the jury. Id. And, the evidence amply supported the jury's determination that Medley's actions on behalf of Metropolitan were the quid pro quo for Flisk's promise to lease the commercial building. Indeed, the Seventh Circuit also found this to be the case. Id. (acknowledging that "Flisk mislabeled what he paid Medley as not being some form of bribery, but Flisk made it plan that the substantial down payment to Medley through the warehouse transaction was to induce Medley and reward him for trying to help Flisk save his valuable contract with the CTA"). Therefore, Medley's argument also fails on the merits and reliance on McCormick is misplaced.
 
 
 68
 We reject Medley's argument that evidence of an "explicit agreement" from Medley was required. See Evans v. United States, No. 90-6105, slip op. at 9 (May 26, 1992) (Kennedy, J., concurring) (implicit acknowledgment by official may form basis of quid pro quo requirement). We similarly reject Medley's argument that Flisk's payment after Medley's actions is somehow proof that no quid pro quo situation existed. This is incorrect because it was Flisk's agreement to lease the commercial building in exchange for Medley's "help" that formed the basis of the illegal agreement. Certainly, Medley could not avoid a conviction by simply postponing payment until some undetermined time period in the future. Therefore, we reject Medley's arguments to the contrary.
 
 CONCLUSION
 
 69
 For the foregoing reasons, we deny Medley's habeas petition to vacate his sentence pursuant to 28 U.S.C. Sec. 2255.
 
 
 
 [1]
 18 U.S.C. Sec. 666 provides in pertinent part:
 [whoever] corruptly solicits or demands for the benefit of any person, or accepts or agrees intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more ... shall be fined under this title, imprisoned not more than 10 years, or both.
 18 U.S.C. Sec. 666.
 
 
 [2]
 Medley contended that the Court erred by: (1) permitting the government to call Flisk as its witness; (2) instructing the jury as we did; and (3) denying Medley's motions for acquittal which argued that the evidence did not prove beyond a reasonable doubt that the money actually paid to Medley by a person named John Wilson was a thing of value from Flisk and Metropolitan as charged in the indictment. U.S. v. Medley, 913 F.2d 1248, 1251 (7th Cir.1990)
 
 
 [3]
 We deny Medley's request for an evidentiary hearing on the issues raised in this petition
 
 
 [4]
 True to his concern, this is exactly what happened in July, 1987
 
 
 [5]
 Delgado testified that had she known about Medley's relationship with Flisk, she would not have given Medley's statements "anywhere near the weight that I gave them" and that she would not have relayed his comments to her committee but instead would have reported Medley's situation to the CTA's attorney
 
 
 [6]
 As the Court explained in Strickland:
 [A] court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.
 Id. at 695-96.
 
 
 [7]
 Medley's conclusory statement that his counsels' fixation on bribery instead of influence peddling was the motivating factor in his counsels' erroneous decision to not present any evidence on his behalf is addressed infra